IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MATTHEWS INTERNATIONAL CORPORATION, | ) ) ) | No. 2:23-cv-00704-WSS |
| Plaintiff, | ) ) | *Electronically filed* |
| v. | ) ) | |
| RICHARD BELCOURT and TRIDENT RECYCLING AND REFINING LLC D/B/A TRIDENT RECYCLING, REFINING & REFRACTORY REPAIR, LLC, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

I.   FACTUAL BACKGROUND ................................................................. 2

    A.   About Matthews .................................................................... 2

    B.   Belcourt's Employment with Matthews and Access to Matthews Confidential Information and Trade Secrets ...................................... 3

    C.   Belcourt's Contractual Obligations to Matthews .............................. 4

    D.   Belcourt Establishes a Competing Business and Actively Steals Opportunities from Matthews While on Its Payroll ............................ 7

    E.   Belcourt Abruptly Resigns from Matthews After Stealing Matthews' Confidential Information and Trade Secrets ...................................... 11

    F.   Matthews Protects Its Confidential Information and Trade Secrets ............ 15

II.  THE COURT SHOULD GRANT A PRELIMINARY INJUNCTION AGAINST DEFENDANTS AND ENJOIN BELCOURT FROM WORKING FOR TRIDENT AND FROM MISAPPROPRIATING ITS CONFIDENTIAL INFORMATION AND TRADE SECRETS ................................................................. 16

    A.   Matthews Will Prevail on the Merits ......................................... 16

        1.   Matthews Will Succeed on its Claims under the Defend Trade Secrets Act and Pennsylvania Uniform Trade Secrets Act ................. 17

        2.   Matthews Will Succeed on Its Breach of Contract Claim Against Belcourt ..................................................................... 20

        3.   Matthews Will Succeed on Its Computer Fraud and Abuse Act Claim ........................................................................ 22

        4.   Matthews Will Succeed on Its Other Tort Claims ....................... 23

    B.   Matthews Is Suffering and Will Continue to Suffer Immediate and Irreparable Harm Absent Injunctive Relief .................................... 28

    C.   The Balance of Equities Strongly Favors Granting a Preliminary Injunction ........................................................................ 30

    D.   The Public Interest Strongly Favors Granting a Preliminary Injunction ............. 31

III. CONCLUSION ............................................................................. 33

i

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*AAMCO Transmissions, Inc. v. Singh,*
 2012 U.S. Dist. LEXIS 141764 (E.D. Pa. Oct. 1, 2012)..........................................21

*Advanced Fluid Sys., Inc. v. Huber,*
 295 F. Supp. 3d 467 (M.D. Pa. 2018) ...................................................................18

*B.G. Balmer & Co. v. Frank Crystal & Co.,*
 2016 Pa. Super. LEXIS 516 (Pa. Super. Ct. Sept. 9, 2016)...................................25

*Bimbo Bakeries USA, Inc. v. Botticella,*
 613 F.3d 102 (3d Cir. 2010).........................................................................19, 31

*Campbell Soup Co. v. ConAgra, Inc.,*
 977 F.2d 86 (3d Cir. 1992).................................................................................28

*Catalyst Outdoor Advertising, LLC v. Douglas,*
 2018 U.S. Dist. LEXIS 87146 (E.D. Pa. May 24, 2018) .........................................21

*CentiMark Corp. v. Lavine,*
 2011 U.S. Dist. LEXIS 82691 (W.D. Pa. July 28, 2011) ..................................29, 30

*Church v. Tentarelli,*
 953 A.2d 804 (Pa. Super. Ct. 2008).....................................................................20

*Citibank, N.A. v. Kyle,*
 2015 U.S. Dist. LEXIS 77504 (E.D. Pa. June 16, 2015) .........................................21

*Colonell v. Goodman,*
 78 F. Supp. 845 (E.D. Pa. 1948) ........................................................................26

*Elias Industries, Inc. v. Kissler & Co. Inc.,*
 2:20-CV-01011-CCW, 2021 WL 2141509 (W.D. Pa. May, 26 2021)....................22

*Empire Trucking Co. v. Reading Anthracite Coal Co.,*
 71 A.3d 923 (Pa. Super. Ct. 2013).......................................................................25

*First Health Grp. Corp. v. Nat'l Prescription Adm'rs, Inc.,*
 155 F. Supp. 2d 194 (M.D. Pa. 2001) ...................................................................17

*Fisher Bioservices, Inc. v. Bilcare,*
 2006 U.S. Dist. LEXIS 34841 (E.D. Pa. May 31, 2006) .........................................30

*Freedom Med. Inc. v. Whitman,*
   343 F. Supp. 3d 509 (E.D. Pa. 2018) ....................................................................17

*Giordano v. Claudio,*
   714 F. Supp. 2d 508 (E.D. Pa. 2010) ....................................................................28

*Graphic Mgmt. Associates, Inc. v. Walter Hatt,*
   1998 U.S. Dist. LEXIS 3949 (E.D. Pa. Mar. 18, 1998)........................................32

*Healthcare Servs. Grp., Inc. v. Fay,*
   597 F. App'x 102 (3d Cir. 2015) ...........................................................................29

*Hess v. Gebhard Co. & Inc.,*
   808 A.2d 912 (Pa. 2002)........................................................................................20

*Highmark, Inc. v. UPMC Health Plan, Inc.,*
   276 F.3d 160 (3d Cir. 2001)...................................................................................16

*Huntington Learning Ctrs., Inc. v. Kearns-Jones,*
   2017 U.S. Dist. LEXIS 185270 .............................................................................21

*Inst. for Motivational Living, Inc. v. Sylvan Learning Ctr.,*
   2008 U.S. Dist. LEXIS 9631 (W.D. Pa. Feb. 7, 2008) .........................................31

*Int'l Soc. for Krischna Consciousness, Inc. v. Stadium Auth. of Pittsburgh,*
   479 F. Supp. 792 (W.D. Pa. 1979).........................................................................27

*Jazz Pharm., Inc. v. Synchrony Grp., LLC,*
   343 F. Supp. 3d 434 (E.D. Pa. 2018) ....................................................................18

*John G. Bryant Co. v. Sling Testing & Repair, Inc.,*
   369 A.2d 1164 (Pa. 1977)......................................................................................29

*L.B. Foster Co. v. Barnhart,*
   2014 U.S. Dist. LEXIS 186147 (W.D. Pa. July 30, 2014) ....................................19

*Lakeview Ambulance & Med. Servs., Inc. v. Gold Cross Ambulance & Med.*
   *Servs. Inc.,*
   1995 Pa. Dist. & Cnty. Dec. LEXIS 279, 1995 WL 842000 (Pa. Com. Pl. Oct.
   18, 1995) .................................................................................................................27

*Masure v. Massa,*
   692 A.2d 1119 (Pa. Super. Ct. 1996) ....................................................................29

*Merrill Lynch v. Napolitano,*
   85 F. Supp. 2d 491 (E.D. Pa. 2000) ......................................................................30

*Nat'l Bus. Servs. v. Wright,*
    2 F. Supp. 2d 701 (E.D. Pa. 1998) .............................................................30, 32

*NextGen Health Info. Sys., Inc. v. Messier,*
    2005 U.S. Dist. LEXIS 27243 (E.D. Pa. Nov. 10, 2005) ...........................28

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer*
    *Pharms.,*
    290 F.3d 578 (3d Cir. 2002) ........................................................................30

*Ogontz Controls Co. v. Pirkle,*
    499 A.2d 593 (Pa. Super. Ct. 1985) ...........................................................30

*Par Pharm., Inc. v. QuVa Pharma, Inc.,*
    764 F. App'x 273 (3d Cir. 2019) .................................................................31

*Pestco, Inc. v. Associated Prod., Inc.,*
    2005 Pa. Super. 276 (2005) .........................................................................24

*Phila. Dairy Prod. v. Quaker City Ice Cream Co.,*
    159 A. 3 (Pa. 1932) .....................................................................................27

*Pioneer Commercial Funding Corp. v. American Financial Mortgage Corp.,*
    579 Pa. 275 (2004) ......................................................................................24

*PNC Mortg. v. Superior Mortg. Corp.,*
    2012 WL 628000, 2012 U.S. Dist. LEXIS 25276 (E.D. Pa. Feb. 27, 2012) ....................18, 24

*Prudential Insurance Company of America v. Browne,*
    2006 WL 8450239 (M.D. Pa. January 12, 2006) ........................................20

*Quaker Chemical Corp. v. Varga,*
    509 F. Supp. 2d 469 (E.D. Pa. 2007) .............................................21, 30, 32

*Reading Radio, Inc. v. Fink,*
    833 A.2d 199 (Pa. Super. Ct. 2003) ......................................................26, 27

*Reilly v. City of Harrisburg,*
    858 F.3d 173 (3d Cir. 2017) .................................................................16, 17

*Revzip v. McDonnell,*
    2019 U.S. Dist. LEXIS 211836 (W.D. Pa. Dec. 9, 2019) ..........................28

*Shepherd v. Pittsburgh Glass Works, LLC,*
    25 A.3d 1233 (Pa. Super. Ct. 2011) ...........................................................29

*SI Handling Sys., Inc. v. Heisley,*
    753 F.2d 1244 (3d Cir. 1985) ......................................................................31

*Sylvester v. Beck*,
    178 A. 2d 755 (Pa. 1962) ................................................................................26

*Victaulic v. Tieman*,
    499 F.3d 227 (3d Cir. 2007) ..........................................................................32

**Statutes**

18 U.S.C. § 1030 ..............................................................................................23

18 U.S.C. § 1030(g) .........................................................................................22

18 U.S.C. § 1836(b)(3)(A) ...............................................................................18

18 U.S.C. § 1839 (3)(A)-(B) .............................................................................17

**Rules**

Federal Rule of Civil Procedure 65 ................................................................16

**Other Authorities**

*Restatement of Agency*, § 393(e)....................................................................26

*Restatement (Second) of Agency*, § 393 ........................................................26

*Restatement (Second) of Agency*, § 393, cmt (e) ..........................................26

Restatement (Second) of Agency, § 394 ..........................................................26

*Restatement (Third) of Unfair Competition* § 1, cmt (g) ..............................27

Plaintiff, Matthews International Corporation ("Matthews"), by and through its undersigned counsel and in support of its Motion for Temporary Restraining Order and Preliminary Injunction, respectfully states as follows:[1]

The requested temporary restraining order ("TRO") and preliminary injunction is necessary to prevent immediate and irreparable harm to Matthews' business. Defendant Richard Belcourt ("Belcourt"), Matthews' former Supervisor Service – Western Region, entered into a 2009 Agreement when he commenced employment with Matthews ("First Covenant Agreement"), and then a 2020 Confidentiality, Non-Solicitation, Non-Competition, and Intellectual Property Agreement ("Second Covenant Agreement," and collectively, Belcourt's "Covenant Agreements"). Belcourt has, among other things, breached the non-compete, non-solicitation, and non-disclosure covenants of the Covenant Agreements by creating a new entity to compete directly with Matthews, defendant Trident Recycling and Refining LLC d/b/a Trident Recycling, Refining & Refractory Repair, LLC ("Trident"), prior to and continuing within two (2) years of terminating his employment with Matthews and by retaining and misusing Matthews' confidential information. Compl. at 2.

Belcourt's work at Matthews focused on managing key areas of Matthews' Environmental Services division ("MES"), which is involved in the service, repair, and maintenance of high-performance cremators that are used by funeral homes and cemeteries throughout the United States. Matthews entrusted Belcourt with highly confidential and proprietary information, including information regarding its Environmental Services business, and the development of relationships with some of Matthews' most valuable customers. Belcourt established Trident to

---

[1] The facts giving rise to Matthews' claims are fully set forth in Matthews' Verified Complaint and its attachments. Matthews incorporates its Verified Complaint herein by reference. (*See* Verified Complaint (ECF No. 1).)

directly compete in the cremator service, repair, and maintenance business.  *Id.*  Now, contrary to the obligations in his Covenant Agreements with Matthews, Belcourt has taken the confidential and strategic information he gained at Matthews to run Trident as a direct competitor.  Indeed, in the days and weeks leading up to his departure from Matthews, Belcourt was accessing, copying, transferring, and deleting highly sensitive and confidential business information from his Matthews computer.  The competitive value and advantage Matthews obtained through these strategic investments will be substantially impacted if Belcourt is able to put Matthews' technical and non-technical trade secret information to work for Matthews' competitor.  Accordingly, and for the reasons detailed below, an emergency TRO and/or injunctive relief is necessary to prevent irreparable harm to Matthews.

## I.     FACTUAL BACKGROUND

### A.     About Matthews

Founded in 1850, Matthews is headquartered in Pittsburgh, Pennsylvania and is one of its oldest, continually operating businesses.  Compl. ¶ 18.   Matthews, through MES, is a designer, manufacturer, and marketer of both traditional flame-based and water-based biological cremation equipment, cremation services and supplies, environmental systems, crematory management/operations, cremation columbarium and niche parts and cremation urns for use primarily in funeral homes, cemeteries, crematories, pet crematories, animal disposers and by veterinarians in the United States, Canada, Europe, Latin America, and Australia.  Compl., ¶ 19.  Matthews is a global leader in cremation equipment, manufacturing leading edge cremation systems and related parts and supplies.  Compl., ¶ 20.

Matthews provides its customers with an array of services, including on-call field service and technical support by phone and email, including through its M-pyre Cremation Technology system.  Compl., ¶ 21.  The M-pyre system features remote capabilities that allows Matthews'

customers to monitor crematory activity, create performance reports, and communicate with Matthews' technical support via the internet.  M-pyre is comprised of four major components: (a) state-of-the-art electronic fuel, air, and burner controls; (b) programmable logic controller; (c) the MyMpyre.com Web Server; and (d) an instant support notification system, which notifies Matthews and its customers whenever something needs attention.  Compl., ¶ 22.

Matthews also invests significantly in regional and nationwide recruiting and development to employ individuals of talent and develop its employees' talents and special skills in a unique field.  Compl., ¶ 23.  In an ongoing effort to improve its products and services, Matthews requires its employees to spend hours in the classroom and in the field learning the most advanced techniques in crematory service, repair and maintenance.  Compl., ¶ 24.

### B. Belcourt's Employment with Matthews and Access to Matthews Confidential Information and Trade Secrets

On August 17, 2009, Matthews hired Belcourt as a service technician.  In that role, Belcourt was given direct access to Matthews' customers and was responsible for repairing, rebuilding, troubleshooting and upgrading cremation equipment for Matthews' customers.  Compl., ¶ 25. Belcourt gained significant experience retrofitting Matthews' proprietary M-pyre system to retorts, rebuilding cremators, rewiring and replacing componentry parts and replacing crematory stacks, ceilings and floors.  Compl., ¶ 26.  Matthews, at its expense, provided Belcourt with significant and valuable training to allow him to perform his role as a service technician for Matthews. Compl., ¶ 27.

In addition, to enable Belcourt to effectively perform these duties, Matthews granted him access to information, including but not limited to, *information concerning, past, present and prospective business contacts and customers,* such as customer contact information, purchase histories, preferences requirements, service methods and customer confidential information;

3

*information relating to sales of products and services*, such as pricing strategies, marketing strategies, marketing information, branding, earnings and cost information, profitability, contracts, sales information, sales methods, and sales proposals; product and distribution information, such as formulas, materials, equipment, inventory, sources of supply and material specifications, operational information, and manufacturing information; *technical and operational information*, such as designs, dimensions, research, ideas, know-how, processes, inventions, patents, data/information management systems, computer programs, codes, systems and system improvements, software and software modifications; *business plans and information,* such as strategies concerning joint ventures, partnerships, mergers and acquisitions; and *internal Company information*, such as the business structure, business policies and practices, operating procedures, methods of doing business, work force and personnel information, work assignments, and capabilities of any Company officer or employee.  ("Confidential Information and Trade Secrets"). Compl., ¶ 28.

### C.  Belcourt's Contractual Obligations to Matthews

To protect Matthews' Confidential Information and Trade Secrets, Matthews required that Belcourt execute an Agreement upon hire in 2009.  Compl., ¶ 29.  In the First Covenant Agreement, Belcourt acknowledged:

> In the course of [his] employment with Matthews, it will be necessary for [Belcourt] to acquire certain confidential and proprietary information and/or trade secrets including, but not limited to, proposals, customer lists, customer information, strategies, business methods or practices and other confidential and proprietary customer information (collectively "Confidential Information"); (b) the Confidential Information is the sole property of Matthews and/or its customers; and (c) the use, misappropriation or disclosure of the Confidential Information at any time, would constitute a breach of trust and would cause irreparable harm to Matthews.

Exhibit 1, ¶ 5(A).  Belcourt further agreed as follows:

> Employee agrees to hold and safeguard the Confidential Information in trust for Matthews, its successors and assigns and agrees that he[] shall not, without the prior written consent of Matthews, misappropriate or disclose or make available to anyone for use outside of Matthews' organization at any time either during [Belcourt's] employment with Matthews or subsequent to the termination of [his] employment with Matthews or subsequent to the termination of Employee's employment with Matthews for any reason, any Confidential Information…
>
> Immediately upon [Belcourt's] termination of employment with Matthews, for whatever reason, or upon request of Matthews, [he] agrees to return to Matthews all Confidential Information, written and printed materials and other documents, materials or things, including, but not limited to electronic media and data concerning Matthews' business or customers, whether or not made by [Belcourt].

*Id*., ¶ 5(B).

In addition to his obligations to safeguard and return Matthews' Confidential Information and Trade Secrets, Belcourt also agreed not to compete with Matthews during his employment for the one-year period following his termination from employment within a radius of 100 miles from his employment location.  *Id*., ¶ 6(A).  Belcourt also agreed that "for a period of one (1) year following the termination of his[] employment with Matthews for any reason, [he] [would] not, directly or indirectly, solicit the business of, or do business with any customer or prospective customer of Matthews with whom [he] had direct or indirect contact or about whom [he] may have acquired any knowledge while employed by Matthews, in competition with Matthews."  *Id*., ¶ 6(B).

Belcourt continued to progress in his role for Matthews, eventually becoming a Senior Service Technician, a distinction that afforded him even greater responsibility.  Compl., ¶ 34.  In March 2020, Matthews promoted Belcourt to Supervisor Service – Western Region for MES.  In

connection with his new position, Belcourt was required to sign the Second Covenant Agreement. Compl., ¶ 35.

In the Second Covenant Agreement, Belcourt again agreed not to "use or cause to be used, directly or indirectly, for [his] own benefit or for the benefit of any third party, or disclose or reproduce or make available to any third party, or disclose or reproduce or make available to any party in any manner, directly or indirectly, any Confidential Information or other knowledge or information, except that which is public knowledge, of or relating to the Company's business without prior written consent… Ex. 2, ¶ 1(b). Belcourt also again agreed to "return to [Matthews], either before or immediately upon the termination of [his] employment, all Matthews issued property (including, but not limited to computers, tablets, phones, USB drives, or any other electronic hardware or devices ("Devices"); computer software; keys; and files, records, paper documents and any electronic copies thereof in [his] possession or under [his] control." *Id.,* ¶ 1(c).

Belcourt further understood and agreed that, in the event he "disclos[ed] or misappropriate[d] any Confidential Information [and Trade Secrets]… such conduct [would] constitute a breach of the confidence and trust bestowed upon [Belcourt] by Matthews [and]… injunctive relief, in addition to any other remedies provided by law or in equity, [would] be necessary and appropriate []." *Id.,* ¶ 1(d). During Belcourt's employment with Matthews and for a period of two (2) years after termination, Belcourt also agreed that, within the Territory[2], he would not "directly or indirectly, work for, sell products or services to, consult with or have any interest in any business… which either (i) directly, or through a related entity, has purchased

---

[2] As used in the Second Covenant Agreement, the term Territory refers to the United States excluding California and Oklahoma. *See* Ex. 2, ¶ 2(b).

products or services from MES within the two (2) years preceding [Belcourt's] termination of employment or (ii) engages in a business competitive with MES."  *See* Ex. 2, ¶ 2(b).

Belcourt further agreed that, "for a period of two (2) years after the termination of [Belcourt's] employment, [he] [would] not have direct or indirect contact with any of MES' then current customers, with any of MES' former customers, or with any prospective customs to which [Matthews] has actively solicited business, where that contact has either of the following purposes (which need not be the sole or primary purpose): (1) selling or otherwise providing any type of product or service that MES is in the business of selling or otherwise providing, or (2) encouraging the current, former, or prospective customer to cease doing business with MES, or to curtail business with MES, or not to commence doing business with MES.  *See* Ex. 2, ¶ 2(c).

Belcourt agreed that the "duties and obligations set forth in the [Second Covenant Agreement] [would] not unduly restrict or curtail [Belcourt's] ability to earn a livelihood following [his] termination" and that "the covenants set forth in the [Second Covenant] Agreement are reasonable in duration and scope and in all other respects, based on [Belcourt's] role within the organization and the geographic scope thereof."  *See* Ex. 2, ¶ 4(b).  Belcourt agreed his post-employment obligations to Matthews "shall be extended by the length of time during which [Belcourt] [has been] in breach of Sections 2b, 2c or 2d."  *See* Ex. 2, ¶ 4(d).  Belcourt further agreed to pay "Matthews for all costs and expenses, including attorneys' fees that Matthews incurs if Matthews prevails in whole or in part in an action for breach of the [Second Covenant Agreement]…" *See* Ex. 2, ¶ 4(h).

### D.   Belcourt Establishes a Competing Business and Actively Steals Opportunities from Matthews While on Its Payroll

On August 17, 2021, Belcourt registered Trident Recycling and Refining, LLC as a limited liability company in Florida, which he intended to and did use to compete directly with Matthews.

Compl., ¶ 44.  On behalf of Trident, Belcourt began soliciting cremator maintenance, repair and rebuild work while working for Matthews.  Compl., ¶ 45.

By way of example, Belcourt rebuilt a cremator for a Matthews' customer in January 2022. He then returned to that same customer to perform work for that same Matthews' customer in January 2023 on behalf of Trident, referred to in the following text string:



Notably, Matthews paid for Belcourt's travel expense associated with the work he performed for the Matthews' client on behalf of Trident on January 16, 2023. Matthews was deprived of the opportunity to perform this work.  Compl., ¶ 46.

Similarly, Belcourt did a rebuild for a Matthews' customer at the beginning of February 2023. After she thanked him for the work he performed on behalf of Matthews, he sent her his Trident business card:



Compl., ¶ 47.

In August 2022, Belcourt responded to an emergency call for another customer on behalf of Matthews. By February 18, 2023, he was replacing a cremator floor for that same client on behalf of Trident. Matthews was deprived of the opportunity to perform this work. Compl., ¶ 48.

Another example occurred with respect to a Matthews' customer for which Belcourt was repairing a cremator floor on October 25, 2022. On October 26, 2022, he prepared and emailed a proposal to perform competing work to the same client on behalf of Trident.  Compl., ¶ 49.

Similarly, Belcourt was working with a Matthews' customer to repair a cremator floor, back wall and roof in June 2022.  He returned to that same customer on behalf of Trident a few months later to remove and replace the cremator floor and pillar wall, as is evidenced by the following invoice:

```
Trident Recycling, Refining and Refractory Repair
6200 Golden Belt Rd Odessa, MO 64076
281-788-4146

Invoice for work performed at ███████████████

Unit # 4 Ener-Tec Plus- Removal and replacement of floor and pillar wall.
Cost for repairs $10,000

Unit # 5 Ener-Tec Plus- Removal and replacement of floor, pillar wall and patch of main support wall under throat lintel.
Cost for repairs $10,000

Total amount due: $20,000
Total amount paid: $20,000
Total amount due: $0.00

Thank You for your business

Richard Belcourt
```

Trident was paid $20,000 for the work completed for Matthews' customer, while Belcourt was still employed and being paid to obtain and perform work for Matthews.  Matthews was deprived of the opportunity to perform this work.  Compl., ¶ 50.

The examples described in the preceding paragraphs are not isolated instances.  To the contrary, Belcourt used his employment with Matthews to solicit Matthews' customers on behalf of Trident and, in some instances, to his travel on behalf of Trident.  Compl., ¶ 51.

After moving to Missouri, on February 13, 2023, Belcourt registered Trident in Missouri as a limited liability company, providing repair services:

6200 GOLDEN BELT RD ODESSA, MO 64076-5336

BusinessInformation

| | | | |
|---|---|---|---|
| Business Name: | TRIDENT RECYCLING AND REFINING LLC | | |
| Business Address: | 6200 GOLDEN BELT RD | County: | LAFAYETTE |
| | ODESSA, MO 64076-5336 | | |
| Year Started: | 2023 | | |
| Line of Business: | REPAIR SERVICES | | |

Executive Information

| | | | |
|---|---|---|---|
| Executive Name: | RICHARD A BELCOURT | Executive Title: | PRINCIPAL |

SIC Information

| | | | |
|---|---|---|---|
| Primary SIC: | 7699 | SIC Description: | REPAIR SERVICES, NEC, NSK |
| Primary SIC: | 7699 0000 | SIC Description: | REPAIR SERVICES, NEC, NSK |

Compl., ¶ 52.

> **E.      Belcourt Abruptly Resigns from Matthews After Stealing Matthews'
> Confidential Information and Trade Secrets**

On March 5, 2023, Belcourt resigned from Matthews:

**From:** Richard Belcourt <rbelcourt@matthewsintl.com>
**Sent:** Sunday, March 5, 2023 8:00 PM
**To:** MES Service Operations <MESServiceOperations@matw.com>
**Subject:** RE

After much thought and soul searching, even though I recalled my resignation I am sending this letter as my immediate termination of employment with Matthews. I have to do what is right for myself and my family. There are many reasons for this decision. After 33 years in this industry, I am going to pursue a different path. I will be sending my toolbox, phone and computer as soon as possible.

Thank You,
Richie Belcourt
Western Region Service Supervisor
Matthews Environmental
Apopka, FL 32703
O-407-886-5533
C-407-457-4591

**CONFIDENTIALITY NOTICE:** This message, together with any attachments, is intended only for the addressee. It may contain information which is proprietary, confidential, legally privileged and/or exempt from disclosure. If you are not the intended recipient of this message, you are hereby notified that any disclosure, copying, distribution, use, or any action or reliance on this communication is strictly prohibited. If you have received this e-mail in error, please notify the sender immediately by return e-mail and delete the message, along with any attachments.

⊤

Compl., ¶ 53.

That same day, Belcourt emailed a Matthews' Refractory Drawing to his personal email account:



Compl., ¶ 54.

Concerned that he would no longer have access to Matthews' Confidential Information and Trade Secrets for use in his work for Trident, Belcourt, as a representative of Trident, hacked into Matthews' network for the purpose of stealing Matthews' trade secret refractory drawings ***after he resigned from Matthews***.  Specifically, Belcourt stole the following documents:

| File Name |
|---|
| 1990 PPII.pdf |
| 2017 SPPIII+ refractory.pdf |
| ALL Refractory.pdf |
| ALL Refractory.pdf |
| -Baldwin Apopka ET-PlusBrickPouredFloorR5-.pdf |
| Crawford C700 Refractory.pdf |
| ET-IV+ Refractory REV.pdf |
| ET-IV+ Refractory REV.pdf |
| ET-IV+ Refractory STD NRC.pdf |
| ETIV+17_Refractory.pdf |
| Floor Pour How-2.pdf |
| IEB 32-5 Refractory REV.pdf |
| IEB 32-5 Refractory STD.pdf |
| IEB 32-5S Refractory REV 2014.pdf |
| IEB 32-5S Refractory REV.pdf |
| IEB 32-5S Refractory STD 2014.pdf |
| IEB 32-5S Refractory STD.pdf |
| IEB 50 Refractory STD Arch Roof.pdf |

IEB 56 brick layout Cremation Chamber.pdf
IEB 56 CC brick walls.jpg
IEB 56-4S Refractory (Afterchamber) REV.pdf
IEB 56-4S Refractory (Afterchamber) STD.pdf
IEB 56-4S Refractory (Cremation Chamber) REV.pdf
IEB 56-4S Refractory (Cremation Chamber) STD.pdf
IEB 56-4S Refractory (Insulation) REV.pdf
IEB 56-4S Refractory (Insulation) STD.pdf
IEB 56-4S Refractory REV.pdf
IEB 56-4S Refractory STD.pdf
IEB-16 Refractory REV.pdf
IEB-16 Refractory STD.pdf
IEB-16.pdf
IEB-16.pdf
IEB-16RefractoryR4-0000320.pdf
IEB-20 Refractory REV.pdf
IEB-20 Refractory STD.pdf
IEB-40 Refractory REV.pdf
IEB-40 Refractory STD.pdf
IEB-56 Refractory Hangers REV.pdf
IEB-56 Refractory Hangers STD.pdf
IEB-56 Refractory REV.pdf
IEB-56 Refractory STD.pdf
IEB-8 refractory REV.pdf
IEB-8 refractory STD.pdf
pour.pdf
PPI Refractory REV.pdf
PPI Refractory STD.pdf
PPII+ Refractory (1) (2).pdf
PPII+ Refractory (1) (2).pdf
PPII+ Refractory REV.pdf
PPII+ Refractory STD.pdf
PPII+ Refractory STD.pdf
PPII+ Refractory.pdf
PPII+ Refractory.pdf
PPII+ Refractory.pdf
Refractory ET and other.pdf
Refractory ET and other.pdf
2245-KALAKAST AR ADTECH_(USA) (1).PDF
2825-VERSAFLOW 45 PLUS_(USA).PDF
4690-EXPRESS-30 QS_(USA).PDF
5465-GREENLITE-45-L_(USA).PDF
5605-GREENPATCH-421_(USA).PDF

5897-KS-4 PLUS_(USA).PDF

5951-MC-25 PLUS_(USA).PDF

918B-VERSAFLOW 45 QS PLUS (WM-7535)_(USA).PDF

Refractory PP.pdf

Refractory PP.pdf

Refractory PP-2.pdf

Refractory PP-JR And PP.pdf

Refractory PP-JR And PP.pdf

Refractory Super PP.pdf

Refractory Super PP.pdf

SPP 2000 refractory.pdf

SPP refractory 08.pdf

SPP refractory 08.pdf

SPP refractory 08.pdf

SPP refractory 08.pdf

SPP Refractory with 13 inch bricks Old style.pdf

SPP+ 14 Refractory STD zoom in on AC.pdf

SPP+ 14 Refractory STD.pdf

SPP+ Refractory REV RCO.pdf

SPP+ Refractory REV.pdf

SPP+ Refractory STD RCO.pdf

SPPIII+_Refractory.pdf

SPPIII+17_Refractory.pdf

SPPIIIBrickAfterChamberR5-0000173 Model (1).pdf

SQC-300 Tile How To.pdf

US Cremation ALL MODELS UL REFRACTORY DWGS.pdf

Compl., ¶ 55.

Despite resigning on March 5, 2023, Belcourt continued to use his Matthews' computer to perform work on behalf of Trident and, in fact, repeatedly attempted to log in to the Matthews' network on March 14, 2023, March 15, 2023, March 16, 2023, March 17, 2023 and March 20, 2023. Compl., ¶ 56. Armed with Matthews' Confidential Information and Trade Secrets, Belcourt is now soliciting and performing work for Matthews' customers in direct competition with Matthews. Compl., ¶ 57.

By way of example, on March 16, 2023, Belcourt used his Matthews' computer to create

and email a proposal to perform work on behalf of Trident for a Matthews' customer that he recently worked with on behalf of Matthews:

Proposal to perform maintenance on PPII and PP unit for:



Trident Recycling, Refining and Refractory Repair proposes to perform maintenance inspections on the PPII cremation unit and the PP cremation

Thank you for the opportunity to provide service. Sincerely, Richard Belcourt

Author: Richard Belcourt
Template: Normal
Revision number: 1
Application: Microsoft Office Word
Last printed: 2023/03/16 20:15:00
Created: 2023/03/16 20:07:00

Compl., ¶ 58.  To conceal his actions, Belcourt attempted to wipe his Matthews-provided phone and delete files from his computer, prior to returning them weeks after his resignation. Compl.,  ¶ 59.

**F.    Matthews Protects Its Confidential Information and Trade Secrets**

The significance of Matthews' Confidential Information and Trade Secrets can be measured, in part, by the extensive efforts it undertakes to protect their secrecy.  Matthews' ongoing efforts to protect its Confidential Information and Trade Secrets includes, without limitation, (a) using network firewalls, password protection, and security credentials to prevent unauthorized access to Matthews' servers; (b) limiting its employees' access to information to that which is necessary to fulfill their job functions; (c) requiring employees to sign agreements containing restrictive covenants, including nondisclosure, non-solicitation and/or non-competition agreements; (d) implementing and enforcing policies and procedures to protect its Confidential Information and Trade Secrets, such as the Code of Business Conduct and Ethics; and (e) enforcing

its employees' obligations with respect to its Confidential Information and Trade Secrets.  Compl., ¶¶ 60-63.


II.     **THE COURT SHOULD GRANT A TRO AND/OR PRELIMINARY INJUNCTION AGAINST DEFENDANTS AND ENJOIN BELCOURT FROM WORKING FOR TRIDENT AND FROM MISAPPROPRIATING ITS CONFIDENTIAL INFORMATION AND TRADE SECRETS**

Pursuant to Federal Rule of Civil Procedure 65, Matthews seeks immediate relief in the form of a TRO and/or a preliminary injunction against Defendants to (a) require the return of Matthews' Confidential Information and Trade Secrets; (b) enjoin Belcourt from using or disclosing Matthews' Confidential Information and Trade Secrets; and (c) enjoin Belcourt from working for a competitor, including Trident until such time as a trial on the merits may be held. As set forth above, Matthews can establish all of the elements necessary for a preliminary injunction, and the relief is necessary to prevent the immediate irreparable harm to Matthews.

Rule 65 allows a district court to enter a temporary restraining order. The Court of Appeals for the Third Circuit has applied one standard to a motion for both a TRO and a preliminary injunction. *United States v. Bell*, 414 F.3d 474 (3d Cir. 2005).  A TRO and/or injunctive relief is warranted when the party seeking a TRO and/or injunction establishes: (1) a "reasonable probability of success" on the merits, and (2) "that it will be irreparably injured" without injunctive relief. *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (cleaned up).  If those two factors are met, then the court should consider "(3) the possibility of harm to other interested person from the grant or denial of the injunction, and (4) the public interest." *Id.* (cleaned up).

A.      **Matthews Will Prevail on the Merits**

Matthews is likely to succeed on the merits of this case because it has valid and enforceable agreements with Belcourt, it has legitimate business interests to protect, and Belcourt's breaches

16

of his contractual obligations to Matthews are open, blatant, and obvious.  At this stage, Matthews need only "prove a prima facie case, not a certainty that [it] will win."  *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 173 (3d Cir. 2001).  This "requires a showing significantly better than negligible but not necessarily more likely than not."  *Reilly*, 858 F.3d at 179.  Importantly, this showing need only be met for one claim.  *First Health Grp. Corp. v. Nat'l Prescription Adm'rs, Inc.*, 155 F. Supp. 2d 194, 234 (M.D. Pa. 2001).

### 1. Matthews Will Succeed on its Claims under the Defend Trade Secrets Act and Pennsylvania Uniform Trade Secrets Act[3]

Belcourt has misappropriated Matthews' Confidential Information and Trade Secrets in violation of the Defend Trade Secrets Act of 2016 ("DTSA") by improperly accessing, using, and/or disclosing Matthews' Confidential Information and Trade Secrets.  Not only has Matthews shown a reasonable probability of success on its DTSA claim, its forensic examination already reveals clear evidence of calculated misappropriation by Belcourt prior to and after his abrupt departure from Matthews.

Under the DTSA, the term "trade secret" encompasses:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patters, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if-- (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

---

[3] Although Matthews has brought claims under the DTSA and PUTSA, "the analysis as to the likelihood of success is the same because the DTSA and PUTSA effectively proscribe the same conduct." *Freedom Med. Inc. v. Whitman*, 343 F. Supp. 3d 509, 518 n.6 (E.D. Pa. 2018).

18 U.S.C. § 1839 (3)(A)-(B).

Under the DTSA, "misappropriation" means the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." *Id.* § 1839(5). It also encompasses:

> disclosure or use of a trade secret of another without express or implied consent by a person who--
>
>> (i)    used improper means to acquire knowledge of the trade secret;
>>
>> (ii)   at the time of the disclosure or use, knew or had reason to know that the knowledge of the trade secret was--
>>
>>> (I)    acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>>>
>>> (II)   derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; . . . .

*Id.* "Improper means" include "theft, bribery, misrepresentation, [and] breach or inducement of a breach of a duty to maintain secrecy." *Id.* § 1839(6).

Liability for misappropriation of trade secrets extends not only to the individuals directly engaging in such conduct, but also to their employer who knew or should have known about the misappropriation. *PNC Mortg. v. Superior Mortg. Corp.*, 2012 WL 628000, 2012 U.S. Dist. LEXIS 25276, at *74-75 (E.D. Pa. Feb. 27, 2012). An employer may also be held vicariously liable for misappropriation. *Advanced Fluid Sys., Inc. v. Huber*, 295 F. Supp. 3d 467, 486 (M.D. Pa. 2018). The DTSA also empowers a court to enjoin either actual or threatened misappropriation. *Jazz Pharm., Inc. v. Synchrony Grp., LLC*, 343 F. Supp. 3d 434 (E.D. Pa. 2018) (citing 18 U.S.C. § 1836(b)(3)(A)).

In light of these factors, the evidence will establish that Matthews' Confidential Information and Trade Secrets, including confidential information regarding its customers, are

trade secrets under the DTSA.  Throughout Belcourt's employment, he had access to Matthews' Confidential Information and Trade Secrets, including, but not limited to: (1) information concerning past, present, and prospective business contacts and customers; (2) information relating to sales of products and services; (3) technical and operational information; (4) business plans and information; and (5) internal company information.  *See* Compl., ¶ 28.

As described above, Matthews took the steps necessary to protect its Confidential Information and Trade Secrets.  Here, Matthews' Confidential Information and Trade Secrets were kept in the strictest confidence and were unknown outside the organization.  Furthermore, competition for customers in the cremation sales, service, maintenance and repair business is significant, and Matthews' competitors, including Trident, would find substantial value in having access to a former Matthews service supervisor armed with some of Matthews' most crucial Confidential Information and Trade Secrets.

Indeed, Matthews has evidence that Belcourt took affirmative steps in the days and weeks before and after his resignation to extricate a cache of Matthews' Confidential Information and Trade Secrets.  Through Matthews' forensic examination, it is clear that Belcourt stole Matthews' Confidential Information and Trade Secrets, including Matthews' highly proprietary refractory drawings and using them on behalf of Trident.  Compl., ¶¶ 7, 54, 55, 78, 89.

Belcourt had absolutely no business reason for accessing these files at this time, much less to *copy and store* any such files on a removable storage device.  This amounts to misappropriation under the DTSA.  *See, e.g., L.B. Foster Co. v. Barnhart*, 2014 U.S. Dist. LEXIS 186147, at *8 (W.D. Pa. July 30, 2014) (finding the defendant misappropriated trade secrets by emailing files to his personal email account after accepting competitor's offer of employment); *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 118 (3d Cir. 2010) (affirming district court's ruling that the

defendant intended to misappropriate trade secrets given his receipt of such information after committing to a new job with a competitor and copying of information from his work laptop onto a USB device).  Given this clear evidence of misappropriation, Matthews has shown a reasonable probability of success on its DTSA claim against Defendants.

### 2.   *Matthews Will Succeed on Its Breach of Contract Claim Against Belcourt*

To establish a breach of contract under Pennsylvania law,[4] the plaintiff must show: "(1) the existence of a contract, including its essential terms; (2) the breach of a duty imposed by the contract; and (3) damages."  *Church v. Tentarelli*, 953 A.2d 804, 808 (Pa. Super. Ct. 2008).  Under Pennsylvania law, restrictive covenants are enforceable if they are ancillary to an employment relationship, supported by adequate consideration, reasonable in scope and duration and necessary to protect a legitimate business interest of a former employer.  *See Prudential Insurance Company of America v. Browne*, 2006 WL 8450239, at *4 (M.D. Pa. January 12, 2006); *Hess v. Gebhard Co. & Inc.*, 808 A.2d 912, 917 (Pa. 2002).

Here, the Covenant Agreements were ancillary to the employment relationship between Matthews and Belcourt and supported by adequate consideration in the form of his offer of employment and compensation in 2009 for the First Covenant Agreement, and his promotion in 2020 for the Second Covenant Agreement which accompanied an increase in his rate of pay and eligibility for Matthews' annual incentive program.  Additionally, Belcourt acknowledged in his Covenant Agreements that, in furtherance of his duties for Matthews, he would receive and have access to, certain confidential information and trade secrets.  (First Covenant Agreement § 5(A); Second Covenant Agreement § 1.a.)  Belcourt also had access to and used Matthews' Confidential

---

[4] The Covenant Agreements contain a choice of law provision stating that they will be governed by Pennsylvania law. (*See* First Covenant Agreement § 13; Second Covenant Agreement § 4.i.)

Information and Trade Secrets in the performance of his duties as an employee of the company and in his most recent role as Supervisor Service – Western Region, as described in detail above. Matthews also provided Belcourt with significant and valuable training and instruction to allow him to perform his role as a service technician and introduced Belcourt to its customers and prospective customers.   Accordingly, Matthews has a legitimate interest in protecting its Confidential Information and Trade Secrets, customer goodwill, and the specialized training and instruction it provided to Belcourt by enforcing the terms of the Covenant Agreements.  *See, e.g.*, *Citibank, N.A. v. Kyle*, 2015 U.S. Dist. LEXIS 77504, at \*10-11 (E.D. Pa. June 16, 2015).

The Covenant Agreements also are reasonably limited in time.  Courts routinely uphold restrictive covenants in excess of one year as reasonable.  *See, e.g., Huntington Learning Ctrs., Inc. v. Kearns-Jones*, 2017 U.S. Dist. LEXIS 185270, at \*22-23 (W.D. Pa. Nov. 7, 2017 (citing *AAMCO Transmissions, Inc. v. Singh*, 2012 U.S. Dist. LEXIS 141764 (E.D. Pa. Oct. 1, 2012)) (holding two-year non-compete covenant reasonable); *Catalyst Outdoor Advertising, LLC v. Douglas*, 2018 U.S. Dist. LEXIS 87146, at \*7 (E.D. Pa. May 24, 2018) (noting that "[a] two year limitation for restrictive covenants is generally upheld by Pennsylvania courts").

The geographic scope likewise is reasonable.  Belcourt acknowledged as much in the Covenant Agreements.  Given the geographic breadth of Matthews' business operations and Belcourt's role in servicing customers throughout the U.S., an equally broad restrictive covenant is reasonable and necessary to adequately protect Matthews' legitimate business interests.  *See, e.g., Quaker Chemical Corp. v. Varga*, 509 F. Supp. 2d 469, 476 (E.D. Pa. 2007) ("Courts have upheld non-compete covenants lacking geographic limits (or with very broad geographic restrictions) where the employee's duties and the employer's customers were geographically broad.").  Thus, the restrictive covenants in the Covenant Agreements are enforceable.

Finally, Belcourt cannot reasonably dispute that he is in violation of the Covenant Agreements because he (a) stole Matthews' Confidential Information and Trade Secrets; (b) disclosed Matthews' Confidential Information and Trade Secrets to Trident and/or others; (c) established Trident to actively and directly compete with Matthews for the remaining 18 months of his employment with Matthews and continuing thereafter; and (d) failed to provide Matthews notice of the same.  As a proximate result of Belcourt's actions, Matthews has suffered and will continue to suffer harm which cannot be adequately compensated by monetary damages alone. Accordingly, Matthews has established a reasonable likelihood of success on its breach of contract claim against Belcourt.

### 3.      Matthews Will Succeed on Its Computer Fraud and Abuse Act Claim

The Computer Fraud and Abuse Act ("CFAA") prohibits fraudulent and unauthorized access of computer systems and creates a private right of action for those who suffer damages resulting from prohibited conduct. *Elias Industries, Inc. v. Kissler & Co. Inc.*, 2:20-CV-01011-CCW, 2021 WL 2141509, at *3 (W.D. Pa. May, 26 2021) (citing 18 U.S.C. § 1030(g) ("Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief.").

A civil action for a violation of this section may be brought only if the conduct involves one of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i). 18 U.S.C. § 1030(g).  Subsection (c)(4)(A)(i) provides:

> [A]n offense under subsection (a)(5)(B), which does not occur after a conviction for another offense under this section, if the offense caused (or, in the case of an attempted offense, would, if completed, have caused)—
>
> > (I) loss to 1 or more persons during any 1-year period (and, for purposes of an investigation, prosecution, or other

proceeding brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $5,000 in value;

(II) the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals;

(III) physical injury to any person;

(IV) a threat to public health or safety;

(V) damage affecting a computer used by or for an entity of the United States Government in furtherance of the administration of justice, national defense, or national security…

18 U.S.C. § 1030.

Here, Trident, intentionally, and without authorization, accessed Matthews' password-protected network when its agent, Belcourt, breached Matthews' network for the purpose of stealing Matthews' Confidential Information and Trade Secrets. Belcourt did so in the course and scope of his employment or engagement with Trident and for Trident's benefit. Trident knowingly and with the intent to defraud, accessed Matthews' protected computer without authorization, and by means of such conduct, furthered its intended fraud and obtained information of value, namely Matthews' Confidential Information and Trade Secrets, and such information exceeds $5,000 in value. Accordingly, Matthews is likely to succeed on its CFAA claim.

### 4.    *Matthews Will Succeed on Its Other Tort Claims*

Matthews' Verified Complaint also shows that Defendants' conduct is actionable independent of any contractual or statutory obligation. Defendants' tortious conduct, individually and collectively, also warrants a TRO and/or injunctive relief.

### a. Belcourt has engaged in conversion

In Pennsylvania, conversion "is the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification." *Pioneer Commercial Funding Corp. v. American Financial Mortgage Corp.*, 579 Pa. 275, 289 (2004). To demonstrate that a defendant has converted business information, a plaintiff need not prove that it was dispossessed of the converted item – only that the defendant, "for the purpose of advancing a rival business interest, procures by improper means information about [plaintiff's] business" and that "harm [was] caused by [the defendant's] possession, disclosure or use of the information." *PNC Mortg. v. Superior Mortg. Corp.*, No. 09-5084, 2012 WL 628000 (E.D. Pa. Feb. 27, 2012 (citing *Pestco, Inc. v. Associated Prod., Inc.*, 2005 Pa. Super. 276 (2005)).

Here, Matthews owned, had legal possession of, and was entitled to possession of its Confidential Information and Trade Secrets. Belcourt deprived Matthews of its rights to its Confidential Information and Trade Secrets by downloading, stealing and retaining such information in his possession after resigning from his employment with Matthews. Matthews demanded the return of its Confidential Information and Trade Secrets but, to date, Belcourt has failed to return Matthews' Confidential Information and Trade Secrets.

By virtue of his employment with Matthews, Belcourt received opportunities from Matthews' customers to perform work. Belcourt, in turn, converted those opportunities on behalf of Trident, depriving Matthews of the revenue it would have received but for Defendants' actions.

### b. Defendants tortiously interfered with contract, prospective business relations, and prospective economic advantage

To prevail on a tortious interference claim, a plaintiff must prove (1) a contractual relationship between the plaintiff and another; (2) that the defendant intended to harm the plaintiff

by interfering with that contractual relationship; (3) the absence of privilege or justification on the part of the defendant; and (4) damages.  *See Empire Trucking Co. v. Reading Anthracite Coal Co.*, 71 A.3d 923, 932 (Pa. Super. Ct. 2013).  Under this standard, a defendant will be held liable for failing to follow "the rules of the game which society has adopted."  *Id.* at 934 (cleaned up).

Here, Matthews is likely to establish that Defendants interfered with the contracts or prospective business relations of Matthews' customers or prospective contractual relationships. Matthews has hundreds of contracts with crematories and funeral homes across the country of which Belcourt was aware by virtue of his employment with Matthews.  Defendants have no privilege or justification to use Matthews' Confidential Information and Trade Secrets, which they stole, to interfere with the contractual or perspective contractual relationships that Matthews has with its current or prospective customers.  Defendants, through their intentional acts, have intentionally interfered with the contractual and/or prospective contractual relationships that Matthews has with its current or prospective customers, causing it to lose work, opportunities, and revenue from customers that it otherwise would have received but for Defendants' tortious interference.

Trident also tortiously interfered with Matthews' Covenant Agreements with Belcourt. Matthews and Belcourt are parties to valid and enforceable Covenant Agreements and Trident knew of Belcourt's contractual obligations to Matthews.  Despite these facts, Trident knowingly, intentionally, unjustifiably, and in bad faith, induced Belcourt to breach and to continue breaching his Covenant Agreements with Matthews.  Trident's decision to employ and then to continue to employ Belcourt - despite knowing that Belcourt is in breach of his Covenant Agreement, constitutes intentional tortious interference.

c.        **Belcourt breached his fiduciary duty of loyalty to Matthews**

An employee has a fiduciary duty of loyalty to provide services to his employer in accordance with the terms and conditions of that engagement.  *See B.G. Balmer & Co. v. Frank Crystal & Co.*, 2016 Pa. Super. LEXIS 516 (Pa. Super. Ct. Sept. 9, 2016); *Reading Radio, Inc. v. Fink*, 833 A.2d 199 (Pa. Super. Ct. 2003).  Further, an employee has a duty to "act with the utmost good faith in the furtherance and advancement of the interests of his" employer.  *Sylvester v. Beck*, 178 A. 2d 755, 757 (Pa. 1962).  An employee's duty of loyalty includes "a duty not to act or to agree to act during the period of his [employment] for persons whose interests conflict with those of the [employer] in matters in which the [employee] is employed." Restatement (Second) of Agency, § 394.

"[A]n employee who expects to terminate his employment. . . may not. . . before the termination of his employment, solicit customers for [a] rival business, nor may he do other similar acts in direct competition with the employer's business." *Colonell v. Goodman*, 78 F. Supp. 845, 847 (E.D. Pa. 1948) (citing *Restatement of Agency*, § 393(e)); s*ee also Restatement (Second) of Agency*, § 393 ("Unless otherwise agreed, an agent is subject to a duty not to compete with the principal concerning the subject matter of his agency."); *Restatement (Second) of Agency*, § 393, comment (e) (agent "is not, however, entitled to solicit customers for such rival business before the end of his employment nor can he properly do other similar acts in direct competition with the employer's business").

Belcourt owed a duty of loyalty to Matthews based on his employment relationship and under his Covenant Agreements.  As detailed herein, Belcourt breached his duty of loyalty to Matthews when, prior to his resignation and while being paid by Matthews, Belcourt established Trident for the purpose of directly competing with Matthews using Matthews' Confidential

Information and Trade Secrets and downloaded Matthews' Confidential Information and Trade Secrets to a removable storage device so that he could use them on behalf of Trident.

### d.    Defendants are engaged in unfair competition

Unfair competition means "conduct which is contrary to honest, industrial and commercial practices." *Lakeview Ambulance & Med. Servs., Inc. v. Gold Cross Ambulance & Med. Servs. Inc.*, 1995 Pa. Dist. & Cnty. Dec. LEXIS 279, 1995 WL 842000, at *1 (Pa. Com. Pl. Oct. 18, 1995) (citing *Int'l Soc. for Krischna Consciousness, Inc. v. Stadium Auth. of Pittsburgh*, 479 F. Supp. 792 (W.D. Pa. 1979)).  If an employee (1) breaches his employment contract and improperly begins to compete with his former employer or (2) improperly uses his former employer's confidential and proprietary information in competition with his former employer, the employee is liable for unfair competition.  *See Phila. Dairy Prod. v. Quaker City Ice Cream Co.*, 159 A. 3, 5 (Pa. 1932); *Lakeview Ambulance*, 1995 WL 842000, at *1 (citing *Restatement (Third) of Unfair Competition* § 1, cmt (g)).

In addition, "systematically inducing employees to leave their present employment is actionable when the purpose of such enticement is to cripple and destroy an integral part of a competitive business organization rather than to obtain the services of particularly gifted or skilled employees." *Reading Radio*, 833 A.2d at 212 (cleaned up).  A claim for unfair competition lies if the purpose of the inducement is for the "employees to commit wrongs, such as disclosing their former employer's trade secrets or enticing away his customers." *Id.*

As set forth above, Belcourt has committed various wrongful acts including, but not limited to, misappropriating Matthews' Confidential Information and Trade Secrets and violating his Covenant Agreements.  Trident knew, or should have known, of Belcourt's conduct, yet has nonetheless sought to benefit from his wrongdoing.  This conduct supports a finding of liability

27

against Belcourt and Trident for unfair competition.  Thus, the Court should enjoin Defendants from continuing to unfairly compete against Matthews.

### e.    Defendants are engaged in a civil conspiracy

Matthews is likely to establish its claim that Defendants conspired to commit illegals acts designed to unfairly compete with Matthews by demonstrating (as more fully set forth in the previous causes of action): (1) at least two of the Defendants acted with a common purpose to misappropriate Matthews' Confidential Information and Trade Secrets in breach of the Covenant Agreements and in violation of the DTSA; (2) that each of the Defendants acted with a common purpose; and (3) that Matthews has suffered actual legal damage as a result.  *See Giordano v. Claudio*, 714 F. Supp. 2d 508, 534 (E.D. Pa. 2010) (cleaned up).

### B.    Matthews Is Suffering and Will Continue to Suffer Immediate and Irreparable Harm Absent a TRO and/or Injunctive Relief

In the Covenant Agreements, Belcourt explicitly acknowledged that "the use, misappropriation or disclosure of [Matthews'] Confidential Information at any time, would constitute a breach of trust and would cause irreparable harm to Matthews."  (ECF No. 1, Ex. 1 ¶ 5(A).)  Belcourt also stipulated that, in the event of a breach, Matthews would be entitled to "injunctive relief, in addition to any other remedies provided by law or in equity . . . ."  (ECF No. 1, Ex. 2 ¶ 1(d).)

Moreover, the Third Circuit has recognized that "an intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost certainly show immediate irreparable harm." *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 92-93 (3d Cir. 1992).  Indeed, "[t]he use or disclosure of a trade secret almost always constitutes irreparable harm for purposes of issuing an injunction." *Revzip v. McDonnell*, 2019 U.S. Dist. LEXIS 211836, at *21 (W.D. Pa. Dec. 9, 2019); *see also NextGen Health Info. Sys., Inc. v. Messier*, 2005 U.S. Dist.

LEXIS 27243, at *38 (E.D. Pa. Nov. 10, 2005) (explaining that "the use of an employer's confidential and trade secret information to damage its competitive advantage is well recognized as causing irreparable harm").

Likewise, "'the threat of the unbridled continuation of the violation [of a restrictive covenant] and the resultant incalculable damage to the former employer's business establishes irreparable harm.'" *Healthcare Servs. Grp., Inc. v. Fay*, 597 F. App'x 102, 104 (3d Cir. 2015) (quoting *John G. Bryant Co. v. Sling Testing & Repair, Inc.*, 369 A.2d 1164, 1167 (Pa. 1977)). That is because the loss of assets like future business opportunities, client goodwill, and an employer's reputation, along with the loss sustained by the misuse of confidential information, is difficult, if not impossible, to quantify. *See, e.g., Masure v. Massa*, 692 A.2d 1119, 1122 (Pa. Super. Ct. 1996) (holding that the plaintiff "suffered irreparable injury as the number of lost customers cannot be accurately calculated."); *Shepherd v. Pittsburgh Glass Works, LLC*, 25 A.3d 1233 (Pa. Super. Ct. 2011) (noting that Pennsylvania courts will grant injunctive relief to protect employers' trade secrets under appropriate circumstances); *CentiMark Corp. v. Lavine*, 2011 U.S. Dist. LEXIS 82691, at *11 (W.D. Pa. July 28, 2011) (explaining that "[d]amage to customer relationships has been held to constitute irreparable harm").

Because Matthews has established that it is likely to succeed on, at a minimum, its trade secret, breach of contract, and Computer Fraud and Abuse Act claims, it has also established irreparable harm. Indeed, if the Court does not issue a TRO and/or preliminary injunction, the risk of irreparable harm to Matthews will only increase. The Court must put a stop to this now by issuing a TRO and/or preliminary injunction enjoining Defendants from continuing to misappropriate Matthews' Confidential Information and Trade Secrets for the benefit of Trident and Belcourt and Belcourt to his post-employment obligations.

C.      **The Balance of Equities Strongly Favors Granting a TRO and/or Preliminary Injunction**

Before granting a TRO and/or preliminary injunction, the court must balance "the potential injury to the plaintiff if an injunction does not issue versus the potential injury to the defendant if the injunction is issued." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms.*, 290 F.3d 578, 596 (3d Cir. 2002).   When a plaintiff seeks to enjoin a former employee to prevent the use or disclosure of confidential information, the balance of hardships almost always weighs in the employer's favor.  *See Fisher Bioservices, Inc. v. Bilcare*, 2006 U.S. Dist. LEXIS 34841, at *12 (E.D. Pa. May 31, 2006) (enforcing agreement that precluded employee from using confidential information and soliciting business opportunities from customers); *Nat'l Bus. Servs. v. Wright*, 2 F. Supp. 2d 701, 709 (E.D. Pa. 1998) (finding balance of harms weighed in favor of employer because defendant would still be able to earn a livelihood).

Conversely, where, as here, an employee like Belcourt breaches enforceable restrictive covenants by competing against his former employer and using his former employer's Confidential Information and Trade Secrets and goodwill, "'the harm to the employer trumps the harm to the employee.'" *CentiMark*, 2011 U.S. Dist. LEXIS 82691, at *14 (quoting *Quaker Chem. Corp.*, 509 F. Supp. 2d at 480).   Indeed, "[t]he self-inflicted nature of any harm suffered by the wrongdoer [the employee] weighs heavily in favor of granting preliminary injunctive relief." *Merrill Lynch v. Napolitano*, 85 F. Supp. 2d 491, 498-99 (E.D. Pa. 2000).

Matthews has spent significant time and money developing its Confidential Information and Trade Secrets.   Through his work for Trident, Belcourt is using that information to the detriment of Matthews and to unfairly benefit Trident.   Without a TRO and/or injunctive relief, Belcourt will continue to misuse the Confidential Information and Trade Secrets entrusted to him by Matthews for his own gain and the benefit of Trident. *See Ogontz Controls Co. v. Pirkle*, 499

A.2d 593, 597 (Pa. Super. Ct. 1985) (finding that harm was not just likely, but a "certainty," where an employee was engaged in unfair competition with his former employer).  Already, Belcourt's clear aim has been to compete with Matthews for 18 months during his employment and continuing to the present.

The harm that Matthews will continue to suffer far outweighs any harm that Belcourt may experience by being held to his statutory obligations not to misappropriate Matthews' Confidential Information and Trade Secrets and being held to his post-employment obligations to Matthews. Belcourt will not be prevented from working.  He simply will be prohibited from competing directly with Matthews and using Matthews' Confidential Information and Trade Secrets, which he has no right to use for the benefit of anyone but Matthews.

**D.    The Public Interest Strongly Favors Granting a TRO and/or Preliminary Injunction**

"[I]f a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff."  *Inst. for Motivational Living, Inc. v. Sylvan Learning Ctr.*, 2008 U.S. Dist. LEXIS 9631, at *15 (W.D. Pa. Feb. 7, 2008).  That is the case here.

"[T]he public has a clear interest in ensuring fair business practices and safeguarding trade secrets." *Par Pharm., Inc. v. QuVa Pharma, Inc.*, 764 F. App'x 273, 280 (3d Cir. 2019).  That strong public interest is served by upholding "the inviolability of trade secrets[.]" *Bimbo Bakeries*, 613 F.3d at 119 (cleaned up).  Accordingly, in trade secret cases like this, it is "not necessary for the district court to engage in extended analysis of the public interest – extensive precedent supports an injunctive remedy where" -as here - "the elements of a trade secret claim are established." *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1265 (3d Cir. 1985); *see also Bimbo Bakeries*, 613 F.3d at 119. Instead, a TRO and/or preliminary injunctive relief is clearly necessary

to protect the holder of the trade and uphold the public interest, and it "will discourage unfair competition" and "the misappropriation and wrongful use of confidential information and trade secrets[.]" *Wright*, 2 F. Supp. 2d at 709.

Likewise, "restrictive covenants serve an important business interest in today's economy." *Varga*, 509 F. Supp. 2d at 481. They "have developed into important business tools to allow employers to prevent their employees and agents from learning their trade secrets, befriending their customers and then moving into competition with them." *Victaulic v. Tieman*, 499 F.3d 227, 237 (3d Cir. 2007). The public interest is thus served by enforcing such important business tools. *Wright*, 2 F. Supp. 2d at 709.

The impact that Belcourt's defiance will have on other Matthews employees with similar restrictive covenants in their employment contracts is also incalculable. "Restrictive covenants only have value if they are enforced." *Graphic Mgmt. Associates, Inc. v. Walter Hatt*, 1998 U.S. Dist. LEXIS 3949, at *49 (E.D. Pa. Mar. 18, 1998). Thus, "allowing [a former employee] to freely violate his restrictive covenant . . . would encourage [Matthews'] other employees to violate their restrictive covenants." *Id.* In effect, "then the sanctity of the covenants [Matthews] has with other employees will be greatly diminished and [its] ability to enforce these covenants will be curtailed." *Id.* at 49-50.

## III.    CONCLUSION

For the foregoing reasons, the Court should grant Matthews' Motion for Temporary Restraining Order and/or Preliminary Injunction.

Dated:  April 28, 2023

Respectfully submitted,

BUCHANAN INGERSOLL & ROONEY PC

By: */s/ Erin J. McLaughlin*
Jaime S. Tuite *(PA 87566)*
jaime.tuite@bipc.com
Erin J. McLaughlin *(PA 202044)*
erin.mclaughlin@bipc.com
Nicholas J. Bell *(PA 307782)*
nicholas.bell@bipc.com
Union Trust Building
501 Grant Street, Suite 200
Pittsburgh, PA 15219-1410
Phone:     (412) 562-8800
Facsimile: (412) 562-1041

*Attorneys for Plaintiff Matthews International Corporation*

4895-5303-3054, v. 2

33